IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MORGAN HELLER and JOSHUA FLAVIN, on behalf of themselves and all other persons similarly situated, known and unknown, <br><br> Plaintiff, <br><br> v. <br><br> CURALEAF HOLDINGS, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) Case No. 22-cv-1617 ) ) ) ) ) |

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Morgan Heller and Joshua Flavin, on behalf of themselves and all others similarly situated, known and unknown (the "Collective"), complains against Defendant Curaleaf Holdings, Inc. for tip theft in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.* ("IWPCA"), and states:

**NATURE OF THE CASE**

1. This is a hybrid collective action and class action for claims arising under the FLSA and IWPCA for Defendant's tip theft from Plaintiffs and other similarly situated employees of Defendant.

2. Count I is brought as a Collective Action pursuant to the FLSA for tip theft. Heller and Flavin's Collective Action consent forms are attached as Exhibits A and B.

3. Count II is brought as a Class Action pursuant to the IWPCA for tip theft.

4. Plaintiffs allege, on behalf of themselves and all other similarly situated current and former hourly employees who are or were employed at one of Defendant's 126 retail dispensaries in the United States that elect to opt into this action pursuant to the FLSA (hereafter the "Collective"), that they are entitled to unpaid tips withheld or stolen from them by Defendant between March 29,

1

2019 and the date of judgment in this action (the "Collective Action Period"), and liquidated damages pursuant to the FLSA, 29 U.S.C. § 201, et seq.

## JURISDICTION AND VENUE

5. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question); 29 U.S.C. § 216(b) (FLSA), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

6. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1), (2) (venue generally) and 29 U.S.C. § 216(b) (FLSA).

7. Defendant regularly conducts business in this District.

## PARTIES

8. Plaintiff Morgan Heller is an individual and a citizen of Illinois.

9. Plaintiff Joshua Flavin is an individual and citizen of Massachusetts.

10. Defendant Curaleaf Holdings, Inc., is an American cannabis company, traded on the Canadian Stock Exchange under the ticker symbol CURA and is engaged in the production, distribution, and retail sale of cannabis products across North America with its principal offices in Wakefield, Massachusetts.

11. Defendant operates eight retail cannabis dispensaries in Illinois, primarily in Chicago, and the surrounding suburbs.

12. Defendant acquired these retail dispensaries from Grassroots Cannabis in approximately July 2020.

13. Defendant also operates five retail cannabis dispensaries in Massachusetts.

14. Defendant operates a total of 126 retail dispensaries across 23 states.[1]

15. At all relevant times herein, Defendant employed Heller and Flavin, and the Collective they seek to represent and therefore meets the definition of "employer," as defined by the FLSA.

---

[1] https://curaleaf.com/about-curaleaf (last visited 4/14/2022).

and/or IWPCA. 29 U.S.C. § 203(e)(1); 820 ILCS 115/2.

16. At all relevant times herein, Heller and Flavin, and the Collective they seek to represent, were current and former hourly employees who either currently work or worked for Defendant at one or more of Defendant's 126 retail dispensaries that operate in 23 states.

17. Heller, Flavin, and the Collective regularly and consistently had earned tips illegal withheld from their pay.

**FACTS**

Morgan Heller – Northbrook, IL Dispensary

18. Plaintiff Morgan Heller was employed by Defendant at its Curaleaf Dispensary located in Northbrook, Illinois from September 25, 2020, to October 28, 2021.

19. The Northbrook dispensary was staffed by three classifications of employee: manager, "agent in charge," and hourly employee.

20. Upon information and belief, managers were salaried employees.

21. "Agents in charge" were hourly employees but had more responsibility than other hourly employees typically styled as "associates," "team members," and colloquially known as "budtenders" in the cannabis industry.

22. The dispensary hours were 8:00 a.m. to 8:00 p.m. and was open seven days per week.

23. Hourly employees would be assigned to work one of four different eight-hour shifts:

    a. 6:30 a.m. to 3:00 p.m.;

    b. 7:30 a.m. to 4:00 p.m.;

    c. 10 a.m. to 6:30 p.m.; and

    d. 12:00 p.m. to close.

24. At peak dispensary hours from midday to early evening, the dispensary was staffed with approximately 25 hourly employees and 5 managers.

25. Hourly employees would either work on the sales floor assisting customers in the selection of cannabis products or work in the back packing products.

26. Hourly employees were not assigned to either the front or back of the dispensary exclusively, rather during any given shift they could work in either the front or the back.

27. Throughout the course of her employment, Heller was an hourly employee.

28. During her employment, Heller worked both in the front of the dispensary, on the sales floor assisting customers in the selection and purchase of cannabis products, and in the back of the dispensary, stocking and packing product.

29. The Northbrook location typically had approximately ten hourly employees working on the sales floor during peak dispensary hours.

30. Concurrently, at peak hours, the dispensary had, approximately, fifteen to twenty other hourly employees working in the back packing products.

31. Heller worked approximately 32 – 40 hours per week.

32. Heller earned sixteen dollars per hour.

33. It is common in the industry, for cannabis consumers to leave tips and customers at the Northbrook dispensary left tips consistent with industry custom.

34. However, throughout the first month of Heller's employment, the dispensary managers instructed employees they could not accept tips if customers offered them.

35. Despite management's directive, some dispensary employees accepted the tips left by customers.

36. This resulted in disputes between management and employees regarding acceptance of tips and between all hourly employees regarding the division of tips.

37. As a result, after approximately one month, Curaleaf, through its managers, started permitting employees to accept tips in approximately October 2020.

38. After management started permitting employees to accept tips, it allowed the placement of a tip jar in the front of the dispensary near the register into which customers could leave tips.

39. The understanding amongst the hourly employees was that tips would be divided amongst all hourly employees, not just those who worked in front or who directly helped the tipping customer.

40. However, the tips collected in the tip jar were instead confiscated at the end of each day by management, typically Roger Dillman or Nick Rekas, and were not distributed amongst the hourly employees.

41. Heller was never permitted to keep any cash tips she received from customers and no tips were ever distributed by management to her or any other hourly employees.

42. Upon information and belief, the total cash tips confiscated by Defendant was, on average, between $350 and $600 dollars per day.

43. This daily confiscation of cash tips continued between October 2020 through the end of Heller's employment in October 2021.

44. Upon information and belief, as the dispensary was open seven days per week, from October 2020 through October 2021, Defendant's dispensary managers confiscated approximately $126,000 to $216,000 of cash tips from the Northbrook dispensary's hourly employees.

45. Defendant's policy or practice of confiscating Heller's and the Collective's tips violates the FLSA, which set forth, in relevant part: (B) An employer may not keep tips received by its employees **for any purposes**, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit. 29 U.S.C.A. § 203(m)(2)(B) (emphasis added).

5

46. The applicable FLSA regulations, promulgated by the U.S. Department of Labor, define tips as: "(a) A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for the customer." 29 C.F.R. § 531.52.

47. Likewise, the applicable FLSA regulations provide, in relevant part:

(b) Section 3(m)(2)(B) of the Act provides that an employer may not keep tips received by its employees for any purposes, regardless of whether the employer takes a tip credit.

> (1) An employer may exert control over an employee's tips only to distribute tips to the employee who received them, require employees to share tips with other employees in compliance with § 531.54, or, where the employer facilitates tip pooling by collecting and redistributing employees' tips, distribute tips to employees in a tip pool in compliance with § 531.54.

> (2) An employer may not allow managers and supervisors to keep any portion of an employee's tips, regardless of whether the employer takes a tip credit. A manager or supervisor may keep tips that he or she receives directly from customers based on the service that he or she directly and solely provides. For purposes of section 3(m)(2)(B), the term "manager" or "supervisor" shall mean any employee whose duties match those of an executive employee as described in § 541.100(a)(2) through (4) or § 541.101 of this chapter.

29 C.F.R. § 531.52 (emphasis added).

48. Initially, management confiscated the tips and did not disburse them to employees or spend the money. However, this resulted in an increase in cash held within the dispensary, so to get rid of the cash, in October 2020 management started using the confiscated tips to purchase food for the dispensary employees.

49. Employees who were not working the days food was purchased, or who worked certain shifts were lunch was not purchased received nothing.

50. The practice of using confiscated tip money for food persisted until approximately September 2021 when managers began distributing the tip money as "lunch money" to employees each day in the amount of approximately twenty dollars.

51. Defendant only enacted this "lunch money" practice for approximately three days, before reverting to confiscating tips and using it to purchase food.

6

52. When Heller first started and underwent employee training, Curaleaf, which was opening a dispensary in Melrose Park, had Melrose Park employees undergo training at the Northbrook dispensary.

53. Melrose Park employees with whom she interacted also reported that management at that dispensary also engaged in a similar confiscation of cash tips.

54. Upon information and belief, this practice of dispensary managers confiscating tips was not confined to the Northbrook dispensary, but rather, was companywide.

55. Based on information and belief, Defendant ended its policy of confiscating cash tips and started paying the tips out to hourly employees.

56. These employees receive between approximately $60 and $100 dollars in tips per week.

Josh Flavin – Oxford, MA Dispensary

57. Joshua Flavin was employed by Defendant at its Oxford, Massachusetts dispensary from September 2019 to March 2022.

58. Flavin was employed as one of approximately seven hourly employees working the front of the retail, non-medicinal side of the dispensary, assisting customers with the purchase of cannabis products.

59. Defendant's Oxford dispensary served both recreational and medicinal customers, but those operations were separated.

60. As in the Northbrook, Illinois location, the dispensary hierarchy consisted of a general manager, assistant managers, and "team leads" who were hourly employees with greater responsibilities.

61. The Oxford dispensary employed 16-20 employees at any one time, divided evenly between the medicinal and recreational sides of the dispensary.

62. At all times relevant herein, dispensary policies regarding tipping were, identical for

7

the medicinal and recreational sides of the dispensary.

63. Flavin was employed on the recreational side of the dispensary full-time, working five, eight-hour shifts per week.

64. Prior to November 2021, dispensary policy was that Flavin and the other retail associates were not permitted to keep any tips left by customers.

65. The dispensary did not permit the placement of a tip jar in an effort to discourage tipping by retail recreational cannabis customers.

66. Despite this policy, the occasional customer would insist on tipping and Flavin and other employees would be handed approximately $10 to $20 per day from customers.

67. Due to the dispensary policy of prohibiting employees from keeping tips, Flavin and the other employees were not permitted to keep even these modest sums.

68. Instead, dispensary management forced employees to donate tips to charitable causes unilaterally selected by management each month.

69. The dispensary featured extensive security cameras such that employees could not keep tips left for them by customers without dispensary management observing and subsequently forcing them to "donate" their tips.

70. In approximately November 2021, dispensary policy changed. Flavin and the other seven customer-facing employees were permitted to accept tips and the dispensary placed tip jars next to each register.

71. The dispensary implemented a mandatory tip pooling policy whereby Flavin and the other customer-facing employees pooled their tips which were then distributed between the Flavin and the customer facing employees as well as two team leads who worked in the back of the recreational side of the dispensary.

72. During each shift, Flavin and the other retail employees received tips of approximately

8

$30 - 50 on average. Over the course of ten shifts per pay period, this amounted to tips totaling approximately $300 - 500.

73. Flavin was paid bi-weekly.

74. At the end of each shift, all employee's tips were collected in the tip jars by the dispensary's managers such that the tips could be mandatorily pooled and paid out as part of employees' bi-weekly paychecks with required withholding of federal and state taxes.

75. During the course of his employment, despite personally being tipped $300 to 500 at the point-of-sale biweekly, Flavin's biweekly paychecks only included approximately $100 (gross) in tips.

76. Conservatively, if Flavin and the other seven retail employees were each receiving $300 of tips bi-weekly, and accounting for the mandatory pooling with the two team leads, there should have been approximately $2,400 in gross tips being divided between ten employees, whereby each should have been paid at a minimum approximately $240 in gross tips biweekly.

77. Thus, the tips paid in Flavin's biweekly paychecks did not equate to the tips being received from customers and confiscated by management for counting and payout.

78. During the course of his employment Flavin never determined where the balance of the unpaid tip money that he and other employees earned was going (e.g., whether it was being skimmed, stolen, or misappropriated).

79. On information and belief, the medicinal employees at the Oxford dispensary had the same policies and procedures regarding mandatory tip pooling and payment of tips via biweekly paychecks.

## **Collective and Class Allegations**

80. Heller, Flavin, and the Collective Action Members seek to maintain this suit as a Collective pursuant to 29 U.S.C. §216(b) and as a Class pursuant to Fed. R. Civ. Pro. 23, on behalf of

themselves and all other nonexempt employees who were not fully compensated with payment of earned tips during the Collective Action Period.

81. The foregoing allegations related to various forms of tip theft were applicable at all 126 retail Curaleaf locations nationwide and impacted all hourly employees working for Defendant at those locations, to wit, the Collective.

82. Upon information and belief, each dispensary employed upwards of 50 employees at any one time.

83. Over the course of Heller's employment, the Northbrook location saw a high volume of employee turnover. On average 2-3 employees quit each month and were replaced by new hourly employees.

84. Likewise, during Flavin's employment at the Oxford Massachusetts dispensary, he observed regular and consistent rates of employee turnover.

85. Heller, Flavin, and other similarly situated current and former employees in the Collective regularly had tips withheld from their pay, performed the same or similar work, held substantially the same job titles, and were victims of tip theft by Defendant.

86. With the number of Collective members impacted by Defendant's unlawful practices, a Collective action is the proper procedure for adjudicating such claims. Heller and Flavin request that the Court authorize and supervise notice to eligible members of the Collective so that all claims may be resolved efficiently in a single proceeding.

87. Within the Illinois Subclass, Heller and the other similarly situated current and former employees in the proposed class of Defendant's Illinois employees were regularly victims of tip theft by the Defendant, performed the same or similar work, and held substantially the same job titles.

88. Likewise, the number of Defendant employees comprising the Illinois subclass who were impacted by Defendant's unlawful practices makes a class action the proper procedure for

adjudicating any IWPCA claims not subsumed by the FLSA collective action. Heller requests the Court authorize and supervise notice to the members of the class so that all claims may be resolved efficiently in a single proceeding.

89. The records, if any, should be in the custody or control of Defendant concerning the members of the asserted class and the compensation actually paid, or not paid, to such employees.

90. Heller and Flavin will fairly and adequately protect the interests of each proposed collective and class member and have retained counsel that is experienced in class actions and employment litigation.

91. Heller and Flavin have no interest that is contrary to, or in conflict with, members of the collective or class.

## COUNT I – FLSA
## TIP THEFT – COLLECTIVE ACTION

92. Paragraphs 1 – 91 are incorporated by reference herein.

93. This Count arises from Curaleaf's violation of the FLSA through its policy/practice of taking all cash tips earned by Heller, Flavin, and the Collective.

94. The FLSA prohibits employers from keeping tips received by its employees, regardless of whether the employer takes a tip credit. 29 U.S.C.A. § 203(m)(2)(B); 29 C.F.R. § 531.50.

95. Heller, Flavin, and Collective are similarly situated individuals within the meaning of the FLSA, 29 U.S.C. §216(b) in that Curaleaf subjected them all to tip theft, albeit via slightly different methods dispensary-to-dispensary.

96. The confiscation or theft of these earned and owed tips resulted in Heller, Flavin, and the Collective rarely, if ever, being paid the tips owed to them pursuant to the FLSA or being paid the full amount of tips owed to them pursuant to the FLSA.

97. Pursuant to 29 U.S.C. § 216(b), this action may be maintained by a plaintiff who has been damaged by a defendant's failure to comply with 29 U.S.C. §§ 206 – 207. Heller and Flavin attach

as Exhibits A and B their Notices of Consent to Become a Party Plaintiff in a Collective Action under the FLSA.

98. All past and present hourly employees who have worked for Curaleaf nationwide during the previous 3 years are similarly situated to Heller and Flavin.

99. Curaleaf applied its compensation policies, which violate the FLSA, on a company-wide basis, including towards Heller and Flavin.

100. Heller, Flavin, and the Collective were engaged in job duties and responsibilities integral and indispensable to the operation of Curaleaf's business, and neither Heller, Flavin, nor any other member of the Collective has received the full amount of value of the tips owed to them pursuant to the FLSA.

101. Curaleaf's failure to pay Heller, Flavin, and the Collective their tips owed to them pursuant to the FLSA is a willful violation of the Act.

102. Curaleaf's conduct, both the fact that it has since implemented a nationwide policy for payment of tips, had knowledge of employee complaints regarding nonpayment of tips, and the absence of any earlier controls to ensure each dispensary complied with the FLSA, shows that it either knew its dispensaries failure to pay employees earned tips violated the FLSA or recklessly disregarded complying with the FLSA's tip payment provisions.

103. Heller and Flavin's experiences are typical of the experiences of the putative class members.

104. For all members of the putative class to become fully aware of their right to join this cause of action, a certain period of time, as determined by this Court, is necessary to send notice to the entire Class, as well as certain additional time for those members to file consent forms with this Court as provided by 29 U.S.C. § 216(b).

105. The members of the Collective who are still employed by Defendants may be reluctant

12

to raise individual claims for fear of retaliation.

106. As a result of the tip theft, Heller, Flavin, and the Collective suffered damages in the form of earned but unpaid tips.

WHEREFORE, Morgan Heller and Joshua Flavin, on behalf of themselves and all other similarly situated persons, known and unknown, respectfully requests that this Court enter an order as follows:

> A. Determining that this action may be maintained as a collective action pursuant to the FLSA;
>
> B. Awarding judgment for back pay equal to the amount of all unpaid wages for the three (3) years preceding the filing of this Complaint, according to the applicable statute of limitations for willful violations of the FLSA;
>
> C. Awarding liquidated damages in an amount equal to the amount of unpaid wages, to wit, unpaid tips, found due pursuant to the FLSA;
>
> D. Awarding prejudgment interest with respect to the amount of unpaid wages, to wit, unpaid tips;
>
> E. Awarding reasonable attorneys' fees and costs incurred in filing this action;
>
> F. Entering an injunction precluding Defendant from violating the FLSA; and
>
> G. Ordering such other and further relief as the Court deems appropriate and just.

### COUNT II – IWPCA
### TIP THEFT – CLASS ACTION

107. Paragraphs 1-56 and 80-91 are incorporated by reference herein.

108. The IWPCA requires employers to pay their employees according to their agreements and to pay employees all earned wages or final compensation. 820 Ill. Comp. Sta. 115/2.

109. Pursuant to the IWPCA, "(a) Gratuities to employees are the property of the

employees, and employers shall not keep gratuities. Failure to pay gratuities owed to an employee more than 13 days after the end of the pay period in which such gratuities were earned constitutes a violation of this Act." 820 ILCS 115/4.1.

110. Curaleaf forced Heller and the other Illinois Curaleaf employees within the Collective (the "Illinois Subclass") to forfeit all tips earned, which Curaleaf then retained and spent.

111. Curaleaf's tip theft violated the IWPCA.

112. This action is brought as a class action under Fed. R. Civ. P. 23(b)(3) as the number of individuals who comprise the Illinois Subclass is so numerous that joinder of all Subclass members is impracticable. While the precise number of members of the Class has not been determined at this time, Plaintiffs believe Defendant has employed in excess of sixty (60) persons who have been subject to Curaleaf's common unlawful pay practices since it took over operation of the eight retail dispensaries formerly owned and operated by Grassroots Cannabis in or about July 2020.

113. Heller and the Illinois Subclass have been equally affected by Curaleaf's tip theft.

114. The issues involved in this lawsuit present common questions of law and fact, which predominate over any variations that may exist between members of the Subclass.

115. Heller, the Illinois Subclass, and Curaleaf have a commonality of interest in the subject matter and remedy sought.

116. The Illinois Subclass members who are still employed by Defendant may be reluctant to raise individual claims for fear of retaliation.

117. Heller is able to represent and protect the interests of the members of the Illinois Subclass fairly and adequately.

118. Plaintiff's Counsel is competent and experienced in litigating large wage and hour class and collective actions.

119. If individual actions were required to be brought by each member of the Subclass

injured or affected, the result would be a multiplicity of actions, creating a hardship to the members of the Illinois Subclass, to the Court, and Curaleaf. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the Illinois Subclass is entitled.

120. As a result of this unlawful tip theft, Heller and the Illinois Subclass suffered damages in the form of lost wages.

WHEREFORE, Heller, on behalf of herself and all other similarly situated persons, known and unknown, respectfully requests that this Court enter an order as follows:

A. Determining that this action may be maintained as a class action under Fed. R. Civ. P. 23(b)(3);

B. Appointing Heller as Class Representatives and their Counsel as Class Counsel;

C. The amount of Plaintiffs' earned and unpaid wages, to wit, unpaid tips, in accordance with the IWPCA;

D. Statutory damages equivalent to the maximum statutory monthly interest penalties available pursuant to 820 ILCS 115/14;

E. Awarding reasonable attorneys' fees and costs incurred in filing this action; and

F. Ordering such other and further relief as the Court deems appropriate and just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all claims.

Respectfully submitted,

*/s/ Matthew Fletcher*
One of Plaintiffs' Attorneys

Garfinkel Group, LLC
6252 N. Lincoln Avenue, Ste 200

Chicago, IL. 60659
Max Barack (IARDC No. 6312302)
max@garfinkelgroup.com
Matthew Fletcher (IARDC No. 6305931)
matthew@garfinkelgroup.com